UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:   Judges AtLee, Malveaux and Causey
Argued at Norfolk, Virginia


MELVIN EDGARDO MOLINA-RAMOS, S/K/A
  MELVIN EDGAR MOLINA-RAMOS

v.      Record No. 0046-23-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
JUDGE RICHARD Y. ATLEE, JR.
MAY 21, 2024


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
James C. Lewis, Judge

(Diane P. Toscano; Toscano Law Group, P.C., on brief), for
appellant.  Appellant submitting on brief.

Matthew J. Beyrau, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Following a jury trial, the trial court convicted appellant Melvin Edgardo Molina-Ramos of

solicitation to commit murder, conspiracy to commit first-degree murder, gang participation, and

accessory after the fact to a felony homicide.  On appeal, Molina-Ramos argues that the trial court

erred by admitting certain evidence.  He also challenges the sufficiency of the evidence for each of

his convictions.  Finding no error, we affirm.

I. BACKGROUND

"In accordance with familiar principles of appellate review, the facts will be stated in the

light most favorable to the Commonwealth, the prevailing party at trial."  *Poole v. Commonwealth*,

73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).  This

standard requires us to "discard the evidence of the accused in conflict with that of the

---

[*] This opinion is not designated for publication.  *See* Code § 17.1-413(A).

Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn [from that evidence]." *Bagley v. Commonwealth*, 73 Va. App. 1, 26 (2021) (alteration in original) (quoting *Cooper v. Commonwealth*, 54 Va. App. 558, 562 (2009)).

On July 6, 2018, two kayakers on Lake Smith spotted a body along the shoreline and called the police. Officer Christopher Painter of the Virginia Beach Police Department arrived on the scene and observed a body next to the lake, seated in a cross-legged position, slumped forward at the waist. Police later identified the deceased as Jairo Guardado, and they investigated his death as a homicide. The investigation led the police to Molina-Ramos, Cristian Omar Granados-Nuñez, Jose Morales-Arriola, Willian Rodriquez, and Mario Garcia, all of whom were members of MS-13.

At trial, a gang expert testified that MS-13 is a transnational criminal street gang that operates in the United States, Central America, Europe, and Australia. The gang members are involved in a wide range of criminal activity, from property destruction to murder. Its members include both adults and juveniles. The expert testified that the average age of recruit is between 13 and 15 years old, though the youngest gang member the expert had contact with was 9 years old. MS-13 has a hierarchical structure, with the leadership, called the "Ranfla," based in El Salvador. The gang is broken up into smaller groups called "programs." Within each program are smaller, local groups called "cliques," of which there are around 300. Within each clique is a rank structure. The leader of the clique is the "first word," and this person is responsible for communicating with leadership in El Salvador. The second in command is the "second word."

The Viroleños Locos clique, which is a part of the Citsco program, operates in the Hampton Roads area. In 2018, Molina-Ramos was the "first word" of the Viroleños Locos clique, and he was in charge of communicating with the Ranfla in El Salvador. Cristian, who

was recruited by MS-13 when he was 14 or 15,[1] was Molina-Ramos's second-in-command. Jose, Willian, and Mario were all members of the same clique. At trial, Cristian testified that the Viroleños had juvenile members as well as adults.

Jairo Guardado moved to the Hampton Roads area from El Salvador in 2016. He knew many of the MS-13 gang members. He came from the same area of El Salvador as Jose, and he was friends with Willian. Jairo, however, began hanging out with members of the 18th Street Gang, a rival of MS-13, and the members of the Viroleños clique found out. They decided to kill Jairo.

According to the gang expert, killing someone requires permission from the leadership in El Salvador. The first word of the local clique asks the Ranfla for permission, and the Ranfla investigates to determine whether the person should be killed.[2] If the Ranfla agrees to the killing, it gives a "greenlight." The first word then notifies the lower-ranking members. If a member of MS-13 is ordered to kill someone and they do not, they could themselves be killed.

Molina-Ramos "sent a piece of paper" to the leadership in El Salvador, asking for permission to kill Jairo. After an investigation, the leadership agreed and issued a "greenlight." Molina-Ramos then ordered Cristian, Jose, Willian, and Mario to participate in the murder. They discussed the murder, and Molina-Ramos told the others "how to do it" and "what [would] be the easiest way to do it." His plan was for Jose, Willian, and Mario to go to Chesapeake and dig a hole to bury Jairo's body. But "the ground was very wet" and the hole "filled with water," so the plan changed.

---

[1] Cristian was 24 years old at trial, and he testified that Molina-Ramos was the same age as him.

[2] There are many reasons MS-13 will kill someone. The gang may order the death of a person that it believes cooperated with police. It may order the murder of rival gang members, or even its own members that try to leave the gang without permission. Failure to follow a higher-ranking member's order to kill is itself a possible ground for being killed.

On July 5, 2018, approximately one month later, Willian spent the morning working with Jairo. They had been drinking, and Jairo "was a little bit drunk and he was using a lot of cocaine." Willian thought it was a good opportunity to kill Jairo, and he told Jose to get permission from Molina-Ramos or Cristian to do it. Willian's plan was to tell Jairo they were going fishing and then kill him while out fishing. Jose asked Cristian for permission, and after speaking with Molina-Ramos, Cristian told them they had permission. Throughout the day, the group (Willian, Mario, Jose, Cristian, and Molina-Ramos) communicated via WhatsApp about the plan.

Jairo accepted Willian's invitation to go fishing. Driving Jairo's Toyota RAV4, Jairo and Willian picked up Jose and Mario. They drove to Lake Smith in Virginia Beach, where they continued drinking and using cocaine. Initially, they led Jairo to a spot by the lake where they thought they could kill him, but there were people in a boat. They then led him a little deeper into the woods. Once they stopped, Jairo sat down, cross-legged facing the lake. Then they were "just waiting for the right moment."

At trial, Jose testified that by this point he was "already nervous and frightened." This was the first time he had to participate in a murder, and Molina-Ramos had told him "that if this wasn't done, if [Jairo] wasn't murdered, [then] they were going to kill us as well." So Jose messaged Willian asking him "if we were going to do this." But Willian told him they had to wait because Molina-Ramos and Cristian were on their way, and they wanted to participate. They were bringing a knife they wanted to use, which also made Jose nervous. He later explained that it was "easier for [him] to shoot [Jairo] than to see how they were going to use the knife with him."

So, as Willian distracted Jairo, Jose pulled out the gun and shot him from behind. He then passed the gun to Willian and Mario, as everyone was supposed to participate. But the gun

jammed, and Willian could not fix it. Willian took a picture as proof that the killing was completed. The medical examiner later testified that Jairo's death would have occurred within "a couple of seconds to a couple of minutes," and he would have been unresponsive and unmoving the entire time.

As they started to walk out of the park, they ran into a maintenance worker at the park. He asked if they had been shooting off fireworks, and they said no. When the worker closed the park that night, he noticed that a Toyota RAV4 was still in the parking lot. Jose, Willian, and Mario left the park, and they walked down the road. They texted Cristian and Molina-Ramos to come and pick them up. While waiting, they saw both an ambulance and a police car go by, and they were worried that Jairo's body had already been discovered. Because of this, they hid the gun in a park and kept walking. They ended up walking for 30 to 40 minutes before Cristian and Molina-Ramos picked them up. As they got in the car, Molina-Ramos asked "if it had been done well, if the work had been done well." Jose responded that it was still bothering him. Cristian drove them away from the scene, and they ended up going back for the gun the next day.

When the police were investigating, they discovered a key under Jairo's body. It was the key to the RAV4 still in the parking lot. They also discovered a bottle of Corona near the body. From receipts in the RAV4, the police were able to obtain surveillance footage and credit card transaction logs for the purchase of the Corona. From these investigations, Willian became a person of interest.

Virginia Beach Detective James Marafka spoke with Willian, who gave Marafka both the passcode and physical access to his cell phone. The police discovered an image on the phone of Jairo's body that was "very similar to the scene and how [the police] found the victim." They also recovered text messages to multiple cell phone numbers sent on July 5, 2018, the date of the

murder, and phone numbers for Mario, Cristian, Jose, Willian, and Jairo. Additionally, there was a phone number with a (301) area code for a contact listed as "07."

The police subpoenaed the phone records for the (301) phone number. The name associated with the account was "Melvin Ramos." Cell site location data showed the phone was in the area near where Jairo's body was found on July 5, 2018. That number had also called or texted Cristian's, Willian's, Jose's, and Mario's phones nearly 150 times in the one-month period surrounding July 5, 2018. Both Jose and Cristian agreed to cooperate with the police investigation into Jairo's death. Cristian explained that Molina-Ramos was "07" and that this number was like Molina-Ramos's "password" from El Salvador.

Molina-Ramos was indicted for solicitation to commit murder, conspiracy to commit first-degree murder, gang participation, and accessory after the fact to a Class 1 or 2 felony homicide. He was tried in a three-day jury trial in November 2021. Both Cristian and Jose testified against Molina-Ramos.

To prove criminal street gang participation, the Commonwealth had to establish the existence of a criminal street gang. This required the Commonwealth to prove, among other things, that individuals who are members of the same gang as the defendant had committed two or more predicate criminal acts. *See* Code § 18.2-46.1. To do so, the Commonwealth offered two certified copies of prior convictions (and the indictments) into evidence as Commonwealth's exhibit 36. One conviction order showed that Douglas Jonas Hernandez Martinez was convicted of murder and criminal gang participation in Fairfax County in 2017, and the other showed that Venus Lorena Romero Iraheta was convicted of abduction, murder, and criminal street gang participation in Fairfax County in 2018. The indictments showed that both individuals were involved with MS-13.

Molina-Ramos objected, arguing that the exhibit should not be admitted because the Commonwealth had to establish not only that the individuals were members of MS-13, but also that

they were part of the same clique as Molina-Ramos. The Commonwealth contended that the conviction orders were admissible because the gang expert had testified that all cliques are part of MS-13 and loyal to the leadership in El Salvador. The trial court took the issue under advisement. But after further testimony from the gang expert, the trial court overruled the objection and admitted the conviction orders.

Molina-Ramos did not testify or call any witnesses. At the conclusion of the evidence, he made a motion to strike. He challenged the sufficiency of the evidence of related to the various charges against him. The trial court denied his motion to strike. The jury convicted him on all charges. He now appeals those convictions.

## II. ANALYSIS

### A. *Admissibility of Commonwealth's Exhibit 36*

In his first assignment of error, Molina-Ramos contends that the trial court erred by admitting Commonwealth's exhibit 36 into evidence. His argument on brief, however, challenges the sufficiency of the Commonwealth's evidence.

Rule 5A:20(c) requires a party to "list, clearly and concisely and without extraneous argument, the specific errors in the rulings below . . . upon which the party intends to rely." An argument on brief that is not encompassed within an appellant's listed assignments of error is waived. *Fox v. Fox*, 61 Va. App. 185, 202 (2012). Molina-Ramos's argument that the evidence was insufficient to prove his membership in a criminal street gang is not encompassed within his assignment of error because "[w]hether evidence is admissible is a separate issue from whether that evidence is sufficient." *John Crane, Inc. v. Hardick*, 283 Va. 358, 376 (2012) (holding that an argument attacking the sufficiency of the evidence does not adequately support an assignment of error challenging the admissibility of the evidence). Therefore, this argument is waived.

B. *Sufficiency of the Evidence*

Molina-Ramos's remaining assignments of error challenge the sufficiency of the evidence supporting each of his convictions. We address each of Molina-Ramos's arguments in turn.

"We apply a deferential standard of review to challenges based on the sufficiency of the evidence, and the decision of '[t]he lower court will be reversed only if that court's judgment is plainly wrong or without evidence to support it.'" *Otey v. Commonwealth*, 71 Va. App. 792, 797 (2020) (alteration in original) (quoting *Cartagena v. Commonwealth*, 68 Va. App. 202, 207 (2017)). "[T]he relevant question is, upon review of the evidence in the light most favorable to the prosecution, whether *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Id.* (alteration in original) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)).

1. Criminal Street Gang Participation

Code § 18.2-46.2(A), makes committing a crime as part of a gang a Class 4 felony. If, however, the "participant in or member of a criminal street gang is 18 years of age or older and knows or has reason to know that such criminal street gang also includes a juvenile member or participant," then it is elevated to a Class 3 felony. In this assignment of error, Molina-Ramos challenges only the elements elevating the crime to a Class 3 felony. He contends that the evidence did not establish that he was 18 years of age or older at the time of the offense or that he knew or had reason to know that a juvenile was a member of MS-13.

At trial, Cristian testified that he and Molina-Ramos were the same age, and he stated that he was 24 years old at the time of trial. The evidence also established that the murder took place in July 2018. Given that the trial took place in November 2021, Molina-Ramos, depending on his birthday, was either 20 or 21 at the time of the offense. In either case, he was over 18 years of age at the time of the offense.

- 8 -

For his second argument, Molina-Ramos argues that the Commonwealth did not prove "any evidence of a juvenile member of the MS-13 clique that [he] allegedly belonged to or any knowledge that [he] would have had to know that a juvenile was a member of MS-13." He points to *Phillips v. Commonwealth*, 56 Va. App. 526, 541-42 (2010), where this Court reversed a conviction for participation in a criminal street gang that included a juvenile member because the evidence was insufficient to prove that a juvenile was a member of the gang at the time of the criminal activity.

In *Phillips*, the defendant recruited A.G., a juvenile, into the Bloods gang. *Phillips*, 56 Va. App. at 530-31. To join the gang, A.G. had to participate in a "beating in," where he had to fight a member of the gang for 31 seconds. *Id.* at 530. The circuit court based its finding that the gang included a juvenile by finding that A.G. was a member of the gang when he participated in the beating in. *Id.* at 542. But the criminal gang activity alleged was the recruitment of a juvenile—A.G. *Id.* at 541. The defendant asserted that the Commonwealth could not argue both that the recruitment of A.G. was the gang activity and that A.G. was the juvenile member of the gang during that activity. *Id.* This Court agreed, noting that the evidence established that A.G. was not a member of the gang until after the beating in. *Id.* at 542. And logically, any recruitment activity ceased once he was a member. *Id.* Thus, the Court held that A.G. was not a member of the gang during the recruitment process, and the evidence did not support a conviction for participating in a criminal street gang that had a juvenile member. *Id.*

Here, however, the evidence shows that both MS-13 generally and the Viroleños clique specifically had juvenile members. The police expert testified that MS-13 includes juvenile members. He explained that the average age of recruitment is between 13 and 15 years old, though the youngest MS-13 member he had had contact with was 9 years old. Cristian also testified that MS-13 recruited him when he was 14 or 15 years old.

Furthermore, Cristian specifically testified that the Viroleños clique had juvenile members. Though he did not specifically state that there were juvenile members on the date of the offense, the questions he was responding to were in the past tense. Given that, and the overall context of his testimony about the Viroleños clique and his membership in it, a reasonable factfinder could conclude that he was not speaking about the gang membership on the date of trial, but rather at the time of the offense. Considering the evidence of MS-13's recruitment habits and viewing Cristian's testimony in the light most favorable to the Commonwealth, the evidence is sufficient to infer that there were juvenile members of the gang on the date of the offense.

Additionally, Molina-Ramos was the leader of the MS-13 clique in Norfolk and Virginia Beach. The jury could infer that Molina-Ramos had at least the same knowledge as Cristian, who was lower in rank than him. Thus, the evidence is sufficient to show that Molina-Ramos either knew, or through his leadership position had reason to know, that there were juvenile members of the gang. Accordingly, the evidence supports his conviction.

### 2. Solicitation to Commit Murder

Molina-Ramos argues that the evidence was insufficient to support his conviction for solicitation to commit murder.

Code § 18.2-29 prohibits solicitation to commit a crime. Under Code § 18.2-29, it is unlawful for any person to "command[], entreat[], or otherwise attempt[] to persuade another person to commit a murder." The crime of solicitation "involves the attempt of the accused to incite another to commit a criminal offense." *Brooker v. Commonwealth*, 41 Va. App. 609, 614 (2003) (quoting *Branche v. Commonwealth*, 25 Va. App. 480, 490 (1997)). "It is immaterial whether the solicitation has any effect and whether the crime solicited is in fact committed. . . . The gist

of [the] offense is incitement." *Id.* (alterations in original) (quoting *Branche*, 25 Va. App. at 490).

Molina-Ramos argues that the evidence is insufficient because the order to kill a person comes from El Salvador and he did not have the authority to have anyone killed. We disagree. It was Molina-Ramos who asked the Ranfla in El Salvador for permission to kill Jairo when he learned of Jairo's association with a rival gang. Thus, although El Salvador must approve, there was testimony that Molina-Ramos initiated the entire process.

Further, upon receiving approval, Molina-Ramos ordered Cristian, Willian, Jose, and Mario to participate in killing Jairo, and he told them how to do it. Even after the first plan fell through, Molina-Ramos continued to incite the others to kill Jairo, threatening that if they did not kill Jairo, they would be killed. Accordingly, the evidence is sufficient to establish that the order to kill Jairo came from Molina-Ramos and the trial court did not err in convicting him of solicitation to commit murder.

### 3. Conspiracy to Commit a Felony

Molina-Ramos argues that the evidence was insufficient to support his conviction for conspiracy to commit a felony. Specifically, he argues that the evidence did not show that he and his co-conspirators agreed to commit murder. We disagree.

Under Code § 18.2-22(a), it is unlawful for any person to "conspire, confederate or combine with another, either within or outside the Commonwealth, to commit a felony within the Commonwealth." Our "Supreme Court has defined conspiracy as 'an agreement between two or more persons by some concerted action to commit an offense.'" *Carr v. Commonwealth*, 69 Va. App. 106, 117 (2018) (quoting *Wright v. Commonwealth*, 224 Va. 502, 505 (1982)). "Conspiracy 'requires knowledge of and voluntary participation in' the agreement to carry out the criminal act." *Id.* (quoting *Zuniga v. Commonwealth*, 7 Va. App. 523, 527 (1988)). "The

agreement is the essence of the conspiracy offense." *Fortune v. Commonwealth*, 12 Va. App. 643, 647 (1991) (quoting *Zuniga*, 7 Va. App. at 527-28). "'[M]ost conspiracies are "clandestine in nature,"' and '[i]t is a rare case where any "formal agreement among alleged conspirators" can be established.'" *Carr*, 69 Va. App. at 118 (alterations in original) (quoting *Johnson v. Commonwealth*, 58 Va. App. 625, 636 (2011)). Thus, "[p]roof of an explicit agreement is not required, and the Commonwealth may, and frequently must, rely on circumstantial evidence to establish the conspiracy." *Combs v. Commonwealth*, 30 Va. App. 802, 810 (1999).

Here, the evidence is sufficient to prove that Molina-Ramos and the other members of his clique conspired to murder Jairo. Jose and Cristian both testified about Molina-Ramos's participation in planning the murder. Molina-Ramos contacted the Ranfla in El Salvador to get permission to kill Jairo. Once they received the "greenlight," Molina-Ramos, Willian, Mario, and Jose discussed how to kill Jairo. It was Molina-Ramos who came up with the "easiest way" to do it. Even when the plan changed, Jose sought permission from Cristian and Molina-Ramos prior to executing the new plan. And Jose testified that they were supposed to wait to kill Jairo because Molina-Ramos and Cristian were on the way and "wanted to participate" in the murder. There was also evidence that Molina-Ramos called or texted the other members of the group nearly 150 times in the month surrounding the murder. Taken together, this is sufficient evidence that Molina-Ramos and his co-conspirators agreed to murder Jairo.

### 4. Accessory after the Fact

Molina-Ramos next argues that the evidence was insufficient to find him guilty of accessory after the fact to a homicide because the co-defendants who testified could not identify the (301) phone number as belonging to Molina-Ramos. We disagree.

Although Code § 18.2-19 sets out the punishment for the offense of accessory after the fact, the definition of the offense comes from the common law. *Suter v. Commonwealth*, 67 Va. App.

311, 319 (2017). Under the common law, "an accessory after the fact 'is a person who knowing a felony to have been committed by another, receives, relieves, comforts or assists the felon.'" *Id.* (quoting *Wren v. Commonwealth*, 67 Va. (26 Gratt.) 952, 955 (1875)). Our Supreme Court has set out three elements to the crime of being an accessory after the fact to a felony: "First, the felony must be complete. Second, the accused must know that the felon is guilty. Third, the accused must receive, relieve, comfort, or assist the felon." *Commonwealth v. Dalton*, 259 Va. 249, 253 (2000). "In determining whether the accused had knowledge of the underlying felony, the accessory after the fact need not have actual knowledge that the principal is guilty of the felony." *Suter*, 67 Va. App. at 320. "Instead, what is required is that the accessory after the fact knew or should have known that the principal was guilty of committing a felony at the time he provided assistance." *Id.*

Molina-Ramos contends that the Commonwealth's evidence connecting him to the murder largely depended on text message transcripts showing that the owner of the cell phone with the (301) phone number was the one that greenlit the murder of Jairo. He argues that the evidence did not establish him as the owner of that cell phone. We find this argument unpersuasive.

The evidence did in fact link Molina-Ramos to the cell phone number. The telephone records in evidence indicate that the name on the account for the (301) phone number was Melvin Ramos. Further, that phone number was listed in Willian's phone under the contact name "07," which is Molina-Ramos's "password" assigned to him from gang leadership in El Salvador.

Even without the cell phone evidence, the evidence was sufficient to establish that Molina-Ramos acted as an accessory after the fact to the murder. The evidence established that Jairo died within minutes of being shot. Jose, Willian, and Mario walked for 30 to 40 minutes before Molina-Ramos and Cristian picked them up, meaning Jairo was dead and the felony was complete. Molina-Ramos helped plan the murder, and he was on his way to participate in it. When

he and Cristian picked the others up shortly after the murder, he asked Jose "if it had been done well, if the work had been done well." This indicates that Molina-Ramos knew that the others had killed Jairo. And knowing that the others had just killed Jairo, Molina-Ramos assisted them in getting away from where the crime took place by picking them up. Accordingly, the evidence is sufficient to support his conviction for accessory after the fact to murder.

### III. CONCLUSION

For the foregoing reasons, we affirm the decision of the trial court.

*Affirmed.*

Causey, J., concurring in part, and dissenting in part.

I dissent from Part II, Section A and Part II, Section B.1. of the majority opinion and concur in the remainder of the opinion. I would reach the merits of Molina-Ramos's argument that the circuit court erred in admitting Commonwealth's Exhibit 36 because his brief sufficiently states this argument. Molina-Ramos's argument that the Commonwealth did not meet its burden to establish that the exhibit was conditionally relevant necessarily includes both admissibility of and sufficiency of the evidence analyses. I would reverse Molina-Ramos's conviction under Code § 18.2-46.2(A) as a Class 4 felony because the evidence insufficiently establishes that Molina-Ramos knew or had reason to know that MS-13 or the Viroleños Locos clique had a juvenile member at the time of the offenses. I would remand the case for a trial on a charge under Code § 18.2-46.2(A) as an offense no greater than a Class 5 felony, if the Commonwealth elects to do so.

<u>Admissibility of Commonwealth's Exhibit 36</u>

Molina-Ramos's argument about the admissibility of Commonwealth's Exhibit 36 was not waived. The majority concludes that although Molina-Ramos assigns error to the admission of the exhibit, he argues about the sufficiency of the evidence. But Molina-Ramos's argument encompasses both of these concepts because he argues that Exhibit 36 was conditionally relevant. In other words, he argues that the admission of Exhibit 36 was conditional upon establishing certain facts. He further argues that the Commonwealth did not sufficiently establish the facts that would have made Exhibit 36 admissible. Specifically, Molina-Ramos argues that the relevance of Exhibit 36, which the Commonwealth alleged contained the Fairfax County convictions of two MS-13 members, was for the Commonwealth to prove that the Viroleños Locos clique was a criminal street gang under Code § 18.2-46.1. He argues that the Commonwealth first had to establish that the defendants in those conviction orders were MS-13 gang members and then that the Fairfax sector of MS-13 and the Viroleños Locos clique were part of that same "gang."

"The factual determinations which are necessary predicates to rulings on the admissibility of evidence and the purposes for which it is admitted are for the trial judge and not the jury." *Rabeiro v. Commonwealth*, 10 Va. App. 61, 64 (1990). "On factual issues relating to the admissibility of evidence, the burden of persuasion is proof by a preponderance of the evidence." *Id.* at 64-65 (concluding that "the trial judge had to determine whether the evidence . . . established a *prima facie* case of conspiracy"). "The trial court's factual findings in making its admissibility determination are to be given the same weight as is accorded a finding of fact by the jury." *Id.* at 64.

Under Code § 18.2-46.1:

> "Criminal street gang" means any ongoing organization, association, or group of three or more persons, whether formal or informal, (i) which has as one of its primary objectives or activities the commission of one or more criminal activities; (ii) which has an identifiable name or identifying sign or symbol; and (iii) *whose members individually or collectively have engaged in the commission of, attempt to commit, conspiracy to commit, or solicitation of two or more predicate criminal acts*, at least one of which is an act of violence, provided such acts were not part of a common act or transaction.

(Emphasis added).

To show that an organization is a gang under Code § 18.2-46.1:

> [S]omething more than a shared ideology or philosophy, or a name that contains the same word, must be shown before multiple units can be treated as a whole when determining whether a group constitutes a criminal street gang. Instead, some sort of collaborative activities or collective organizational structure must be inferable from the evidence, so that the various groups reasonably can be viewed as parts of the same overall organization.

*Taybron v. Commonwealth*, 57 Va. App. 470, 484 (2011) (quoting *People v. Williams*, 130 Cal. Rptr. 2d 810, 813, 816 (Cal. Ct. App. 2008)). *Taybron* further discusses Virginia jurisprudence on the nuanced determination of whether an organization is a criminal street gang.

- 16 -

Molina-Ramos argues that to admit Exhibit 36, the Commonwealth had to show that the defendants named in the convictions were MS-13 members and that the Fairfax sector of MS-13 and Viroleños Locos clique were part of the same "gang" as defined by Code § 18.2-46.1 and caselaw. This argument is sufficiently set out in his brief. Thus, I would reach the merits of this issue instead of determining that Molina-Ramos's argument was procedurally barred, as the majority has.

### Sufficiency of Evidence for Conviction under Code § 18.2-46.2(A)

The evidence does not sufficiently establish that Molina Ramos "kn[ew]or ha[d] reason to know that such criminal street gang also includes a juvenile member or participant." Thus, I dissent from the majority's affirmance of Molina-Ramos's conviction under Code § 18.2-46.2(A) as a Class 4 felony.

"[T]he burden is on the Commonwealth to prove every essential element of the offense beyond a reasonable doubt." *Powers v. Commonwealth*, 211 Va. 386, 388 (1970).

Under Code § 18.2-46.2(A):

> Any person who actively participates in or is a member of a criminal street gang and who knowingly and willfully participates in any predicate criminal act committed for the benefit of, at the direction of, or in association with any criminal street gang shall be guilty of a Class 5 felony. However, if such participant in or member of a criminal street gang is age eighteen years or older *and knows or has reason to know that such criminal street gang also includes a juvenile member or participant, he shall be guilty of a Class 4 felony.*

(Emphasis added).

In *Phillips v. Commonwealth*, 56 Va. App. 526 (2010), this Court reversed the defendant's conviction for a Class 4 felony under this statute because evidence that could have established this element of the offense was too circumstantial. *See id.* at 542. The Court declined to find that evidence "that [Phillips] was often seen in the company of individuals

- 17 -

wearing red and black clothing and paraphernalia who appeared to be juveniles" established beyond a reasonable doubt that Phillips knew or had reason to know that Phillips's gang, the Bloods, included a juvenile member or participant. *Id.* The Court concluded that the circuit court was correct in finding that this evidence "did not prove that these juveniles were gang members" because "wearing the Bloods-favored colors did not automatically constitute proof of membership in that group." *Id.* In other words, it was too far of an inference—short of beyond a reasonable doubt—to say that juveniles wearing the gang's colors in the presence of a known gang member were themselves gang members.

The Court also concluded that a juvenile's participation in a "recruitment activity" to recruit the juvenile to the gang did not support elevation of Phillips's conviction to a Class 4 felony. It arrived at this conclusion because the juvenile was not a member of the gang until the predicate act—the recruitment activity meant to recruit that same juvenile to the gang—was complete. This conclusion shows that to establish that a defendant knew or had reason to know the gang included a juvenile member or participant, the Commonwealth had to establish that a juvenile was a member of the gang *at the time the predicate act was committed. Id.*

Both pieces of evidence that the Commonwealth offered to establish Phillips's purported knowledge of a juvenile gang member were direct evidence that Phillips was seen in a juvenile's presence. These pieces of *direct* evidence ultimately were too tangential to meet the Commonwealth's burden.

The majority claims that the general testimony from the police expert "that MS-13 includes juvenile members" and Cristian's testimony that the Viroleños clique had juvenile members sufficiently establish that the gang had juvenile members at the time of the offense. The majority concedes that Cristian "did not specifically state that there were juvenile members on the date of the offense" but reasons that "the questions [Cristian] was responding to were in

- 18 -

the past tense." Thus, they draw the far-reaching inference that "a reasonable factfinder could conclude that [Cristian] was not speaking about the gang membership on the date of trial, but rather at the time of the offense." The majority also draws the inference that because "Molina-Ramos was the leader of the MS-13 clique in Norfolk and Virginia Beach," "[t]he jury could infer that Molina-Ramos had at least the same knowledge as Cristian" or that "[Molina-Ramos's] leadership position [gave him] reason to know" about the existence of juvenile members.

As in *Phillips*, such evidence is too circumstantial to establish beyond a reasonable doubt that Molina-Ramos knew or had reason to know that MS-13 or the Viroleños Locos clique included a juvenile member or participant. In fact, the evidence here is much more tangential (much more circumstantial) than the evidence in *Phillips*, and the majority draws more far-reaching inferences then those that the Court declined to draw in *Phillips*. None of the evidence here establishes that either MS-13 or the Viroleños Locos clique had any juvenile members at the time of the offenses. Instead, the majority makes the strained inference that because Cristian answered in the past tense, juveniles were part of the gang at the time of the offense. And although not necessarily required, no one testified that Molina-Ramos was seen around any purported juveniles. Such testimony was insufficient in *Phillips* and is altogether absent here. The majority makes the leap that given Molina-Ramos's leadership position, he had reason to know of these juvenile members, whose existence at the time of the offense has not been established.

Thus, I would "reverse [Molina-Ramos]'s conviction for felony participation in criminal activity for the benefit of a criminal street gang that includes a juvenile, a Class 4 felony" and "remand the case to the circuit court for appellant to be tried on the charge of participation in criminal activity for the benefit of a criminal street gang as an offense no greater than a Class 5 felony, if the Commonwealth be so advised." *Phillips*, 56 Va. App. at 542.

<u>Conclusion</u>

Because Molina-Ramos sufficiently states his argument about why the circuit court erred in admitting Commonwealth's Exhibit 36, I would reach the merits of the issue. The evidence is insufficient to establish that Molina-Ramos knew or had reason to know that the Viroleños Locos clique had a juvenile member at the time of the offenses. Thus, I would reverse and vacate Molina-Ramos's conviction under Code § 18.2-46.2(A) as a Class 4 felony and remand the case for Molina-Ramos to be tried on a charge under Code § 18.2-46.2(A) as an offense no greater than a Class 5 felony, should the Commonwealth so choose.